IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RUTH NATHAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 17-0035-MU |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ruth Nathan brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security ("the Commissioner") denying her claim for Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI"), based on disability. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Doc. 25 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed. R. Civ. P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, … order the entry of a final judgment, and conduct all post-judgment proceedings.")). *See also* Doc. 26. Upon consideration of the administrative record, Nathan's brief, the

Commissioner's brief, and all other documents of record,[1] it is determined that the Commissioner's decision denying benefits should be affirmed.[2]

## I.  PROCEDURAL HISTORY

Nathan applied for a Period of Disability and DIB, under Title II of the Social Security Act, on July 3, 2012, and applied for SSI, based on disability, under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383d, on the same date, alleging disability beginning on June 26, 2012. (Tr. 287-99). After her application was denied at the initial level of administrative review on September 27, 2012, Nathan requested a hearing by an Administrative Law Judge (ALJ). (Tr. 172-83, 186-87). After a hearing was held on January 14, 2014, ALJ L.K. Cooper, Jr. issued an unfavorable decision finding that Nathan was not under a disability from the date the application was filed through the date of the decision, September 2, 2014. (Tr. 149-61). Nathan appealed the ALJ's decision to the Appeals Council, and, on February 22, 2016, the Appeals Council vacated the final decision of the Commissioner and remanded the case under sentence four of 42 U.S.C. § 405(g). (Tr. 167-70). A second hearing was held before ALJ Renee Blackmon Hagler on June 15, 2016. (Tr. 51-77). On August 12, 2016, the ALJ found that Nathan was not under a disability from June 26, 2012 through the date of the decision. (Tr. 26-39). Nathan again appealed the decision to the

---

[1] The parties waived oral argument in this case. (Docs. 23, 24).

[2] Any appeal taken from this Order and Judgment shall be made to the Eleventh Circuit Court of Appeals. *See* Doc. 25 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for the judicial circuit in the same manner as an appeal from any other judgment of this district court.").

Appeals Council, which denied her request for review on November 25, 2016. (Tr. 1-6).

After exhausting her administrative remedies, Nathan sought judicial review in this Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Doc. 1). The Commissioner filed an answer and the social security transcript on April 28, 2017. (Docs. 13, 14). On May 24, 2017, Nathan filed a brief in support of her claim. (Doc. 16). The Commissioner filed her brief on August 8, 2017. (Doc. 19). The parties waived oral argument. (Docs. 23, 24). The case is now ripe for decision.

## II.  CLAIMS ON APPEAL

Nathan alleges that the ALJ's decision to deny her benefits is in error for the following reasons:

1. The ALJ's finding that Nathan's depression and migraines were non-severe impairments is not supported by substantial evidence; and

2. The ALJ failed to correctly apply the Eleventh Circuit's pain standard; thus, the RFC is not supported by substantial evidence.

 (Doc. 16 at p. 2).

## III. BACKGROUND FACTS

Nathan was born on June 19, 1970 and was 42 years old at the time she filed her claim for benefits. (Tr. 287). Nathan originally alleged disability due to Irritable Bowel Syndrome (IBS), acid reflux, migraines, right shoulder problems, and depression. (Tr. 322). At the hearing on June 15, 2016, she testified that she cannot work because of pain in both shoulders, carpal tunnel syndrome in the

right wrist, lower back problems, and headaches. (Tr. 58-61). She testified that she takes medication for depression, and it is controlled with the medication. (Tr. 60-61). She graduated from high school in 1989, attending regular education classes. (Tr. 322-23). She has worked as an industrial cleaner, a food packer, and an overnight retail stocker during the past fifteen years. (Tr. 56-57). In the Function Report that she completed on August 24, 2012, she indicated that she was engaging in normal daily activities at that time; such as driving her daughter to school, light cooking for family members, light cleaning, shopping, sleeping, watching television, reading, helping take care of the family dog, and helping take care of her disabled mother. (Tr. 331-35). She stated that she could take care of her personal needs, although slower and with some difficulty post her shoulder surgery. (Tr. 332). However, at the June 15, 2016 hearing, she testified that she needs assistance shopping, dressing, and combing her hair. (Tr. 63-64). She further testified at the hearing that she does no cooking or housework and spends her days at home in bed watching television. (Tr. 63-64). She can pay bills, count change, handle a savings account, and use a checkbook. (Tr. 334). She can and does drive. (Tr. 62, 334). After conducting the June 15, 2016 hearing, the ALJ made a determination that Nathan had not been under a disability during the relevant time period, and thus, was not entitled to benefits. (Tr. 26-39).

## IV. ALJ'S DECISION

The ALJ made the following relevant findings in her August 17, 2016 decision:

The claimant has also alleged, or the medical record indicates a history of, the following conditions: depression, gastroesophageal reflux disease, irritable bowel syndrome, and migraine headaches (Exhibits 2E, 5F, and 6F). However, although the record shows that the claimant complained of headaches and symptoms associated with irritable bowel syndrome as early as 2008, the claimant's medical records show that she has not complained of or sought treatment for headaches since March 2012 or for irritable bowel syndrome since October 2011(Exhibits 5F and 6F). The claimant has not complained of or been treated for these conditions since at least 3 months before her alleged onset date of June 26, 2012. This is inconsistent with her report that she wakes with headaches daily and her testimony that she has 5 to 6 flares of irritable bowel syndrome every night (Exhibits 2E and 5E). Recent treating source records from Marlo Paul, M.D., document complaints of headache, associated with draining in her ears, cough, and nasal congestion (Exhibit 23F). However, the headaches complained of are not consistent with the claimant's previous reports of migraine headaches and Dr. Paul diagnosed the claimant with a sinus infection, for which he prescribed treatment with an antibiotic, Augmentin (Exhibit 23F). The claimant's sinus infection was responsive to treatment (Exhibit 23F). With respect to the claimant's GERD, there is no evidence of any significant limitations related to this condition (Exhibits 5F and 6F). Finally with respect to the claimant's alleged depression, a plan for the treatment of depression was put in place for the claimant at West Alabama Mental Health Center on May 31, 2012 (Exhibit 7F). The claimant exhibited a major problem with depression, a moderate problem with her judgment, and a minor problem with her insight (Exhibit 7F). Otherwise, her mental status examination was normal (Exhibit 7F). The claimant's level of functioning was deemed normal and she was able to function on her job and in her home (Exhibit 7F). She was diagnosed with major depressive disorder without psychotic features and assigned a global assessment of functioning (GAF) score of 55, with her highest GAF in the past year also being 55 (Exhibit 7F). The claimant's GAF scores are consistent with moderate symptoms or moderate difficulty in social, occupational, or school functioning. When the claimant returned for a counseling session on July 5, 2012, her mood was anxious but her affect was normal (Exhibit 7F). The remainder of her mental status examination was normal as well (Exhibit 7F). While the claimant reported ongoing depression, she did not return for further treatment, which suggests that the claimant's depression is not a severe impairment and does not produce significant limitations (Exhibit 7F). The claimant's depression, GERD, irritable bowel syndrome, and migraine headaches constitute at most only a slight abnormality that cannot reasonably be expected to produce more than minimal, if any, work-related limitations. These impairments are therefore considered to be non-severe (20 CFR 404.1521, 416.921).

\* \* \*

The claimant's medically determinable mental impairment of major depressive disorder does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore non-severe.

In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria.

The first functional area is activities of daily living. In this area, the claimant has no limitation. During the intake process at West Alabama Mental Health Center in May 2012, the claimant was able to function in her work environment and at home (Exhibit 7F). The claimant reported that she was able to do activities related to personal care and hygiene, although she reported some pain with dressing, bathing, caring for her hair, and shaving (Exhibit 4E). She reported spending her days taking her daughter to school, preparing meals, and performing simple household chores, including ironing, cleaning, and laundry (Exhibit 4E). She reported that she mostly prepares frozen meals secondary to fatigue and shoulder problems (Exhibit 4E). The claimant reported that she is able to drive, shop in stores for groceries, and manage money (Exhibit 4E).

At the hearing on June 15, 2016, the claimant testified that she is able to bathe herself but needs her daughters help caring for her hair. She testified that her daughter and son prepare all the meals. She testified that she does not do any household chores. The claimant testified that she has a driver's license and is able to drive but only drives 3 times per week. She testified that she is able to shop in stores but noted that she needs help from her son to reach items on shelves.

Although the claimant has testified to daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision (Exhibits 16F and 21F). Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

The next functional area is social functioning. In this area, the claimant has no limitation. The claimant reported that she spends time with other people "sometimes" but reported that most of the time she is in her bedroom and likes to be alone (Exhibit 4E). The claimant reported that she has problems getting along with family, friends, neighbors, and others because she likes to "stay away from stress", in particular her family, who likes "to argue and fuss" (Exhibit 4E). However, during the intake process at West Alabama Mental Health Center in May 2012, while the claimant reported family conflict, she also reported

socializing with family and friends and spending her leisure time listening to music (Exhibit 7F). Furthermore, the claimant reported that she is able to get along with authority figures and that she has never been fired or laid off from a job because of problems getting along with other people (Exhibit 4E). While the claimant has a limited social network and limited social activities, her reports suggests that she is able to interact with others in an appropriate manner and to behave appropriately in social settings. Accordingly, the claimant has no limitation in social functioning.

The third functional area is concentration, persistence or pace. In this area, the claimant has mild limitation. The claimant reported that she is able to pay attention for "a long time" (Exhibit 4E). She reported that she finishes things that she starts (Exhibit 4E). The claimant reported that she follows written and spoken instructions "very well" (Exhibit 4E). She reported that her impairments do not affect her ability to concentrate but did report problems completing tasks (Exhibit 4E). During the intake process at West Alabama Mental Health Center in May 2012, the claimant exhibited no problems with her attention span, concentration, memory, or coherence (Exhibit 7F). At a July 5, 2012, return visit, the claimant was oriented to person, place, time, and situation, and she had no thought or perceptual disturbances (Exhibit 7F). At the recent hearing, the claimant testified that she is able to pay attention for only 15 minutes at a time and testified that she cannot maintain focus for 2 hour periods. The claimant's testimony is not consistent with the objective medical evidence or her prior reports; nevertheless, the undersigned, in giving the claimant the benefit of the doubt, finds that she has mild limitation in concentration, persistence, and pace.

The fourth functional area is episodes of decompensation. In this area, the claimant has experienced no episodes of decompensation which have been of extended duration.

Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, it is non-severe (20 CFR 404.1520a(d)(1) and 416.920a(d)(1)).

* * *

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

In terms of the claimant's alleged shoulder pain, the record reflects that the claimant has a history of right shoulder pain that began after lifting freight at work (Exhibit SF). X-rays of the claimant's right shoulder were normal; however,

in September 2010, magnetic resonance imaging (MRI) of the claimant's right shoulder showed moderately advanced changes in the AC joint with a small amount of bursitis and moderate tendinopathy without a full thickness tear (Exhibit IF). Anthony Tropeano, M.D., stated on September 8, 2010, that the claimant could return to work with the only restriction being that she could lift no greater than 10 pounds (Exhibit 1F). Dr. Tropeano did not believe that the claimant would have any problems in the workplace secondary to her shoulder (Exhibit 1F).

In January 2012, Kevin Thompson, M.D., diagnosed the claimant with right shoulder impingement and a right partial thickness rotator cuff tear (Exhibit 10F). Dr. Thompson noted that the claimant's symptoms were consistent with shoulder impingement syndrome that might require surgical management (Exhibit 10F). At the claimant's request, she was given an injection and told to return in 3 months (Exhibit 10F). Future surgical options were also discussed with the claimant (Exhibit 13F).

The claimant was still reporting pain in June 2012 (Exhibit 13F). Dr. Thompson recommended surgery, and, on June 29, 2012, the claimant underwent an arthroscopic distal clavicle excision with decompression, SLAP repair, and debridement of a partial thickness rotator cuff tear (Exhibit 13F). When she saw Dr. Thompson for follow-up on July 12, 2012, the claimant reported ongoing shoulder pain that worsened with activity (Exhibit 10F). She rated her pain as 5 out of 10 in severity (Exhibits 10F and 13F). The claimant was kept in a sling and told not to use her right arm (Exhibit 14F).

In August 2012, the claimant rated her pain as 7 out of 10 (Exhibit 10F). Her motion was limited, but she had not attended physical therapy until that week, despite appointments being set up for her (Exhibit 10F). Dr. Thompson continued her in aggressive physical therapy with stretching, noting that if her range of motion did not improve, he would proceed with an injection and possibly manipulation under anesthesia (Exhibits 10F, 13F, and 14F). By the end of August 2012, the claimant still rated her pain as 7 out of 10, but her range of motion was slowly improving (Exhibit 2F). At her October 2012 visit to Dr. Thompson, the claimant's pain was only 2 out of 10 (Exhibit 10F). Dr. Thompson told the claimant that she could gradually return to regular activity and he released her to work and told her to follow-up as needed (Exhibits 10F and 14F).

The claimant thereafter began complaining of left shoulder pain in January 2013 (Exhibit 14F). X-rays of the claimant's left shoulder showed mild to moderate degenerative changes in the AC joint (Exhibit 14F). Dr. Thompson diagnosed the claimant with left shoulder impingement and AC arthrosis (Exhibit 14F). Dr. Thompson requested an MRI of the claimant's left shoulder in May 2013 after her symptoms had not improved with non-operative treatment (Exhibit 14F). The MRI showed a partial thickness rotator cuff tear (Exhibit 14F). Once again, Dr.

Thompson recommended surgery and, on July 9, 2013, he performed a left shoulder arthroscopy with decompression, a distal clavicle excision, and limited debridement of the claimant's partial thickness rotator cuff tear (Exhibits 13F, and 14F). At her July 18, 2013, follow-up visit, the claimant reported that her pain was 5 out of 10 (Exhibit 13F). The claimant's stitches were removed and she was continued in physical therapy (Exhibit 15F). The claimant's pain medications were refilled and she was given a sling for comfort only (Exhibit 14F). Dr. Thompson returned the claimant to work on July 19, 2013 (Exhibit 14F).

When the claimant saw Dr. Thompson in August 2013, she complained of pain and stiffness (Exhibit 14F). However, she reported that she had not been to physical therapy in several weeks because she did not have the time and she could not afford to miss any work (Exhibit 14F). On examination, the claimant had restricted motion and pain, which Dr. Thompson stated was not surprising given her lack of post-operative rehabilitation (Exhibit 14F). He gave her another referral to physical therapy to rehab her shoulder, stating that while she had pain, she did not have any specific activity restrictions (Exhibit 14F).

The claimant returned to Dr. Thompson on October 10, 2013, and she still reported restricted motion and pain (Exhibit 14F). The claimant had only been attending therapy once a week and, according to her therapist, she gave inconsistent effort when she did attend (Exhibit 14F). Dr. Thompson offered the claimant an injection to help her progress with therapy but she declined (Exhibit 14F). Dr. Thompson refilled the claimant's anti-inflammatory medications and encouraged her to perform aggressive stretching in therapy and on her own (Exhibit 14F). Dr. Thompson also agreed to give the claimant pain medications, telling her that at 4 ½ months post op, he would no longer give her pain medication and would see her only as needed (Exhibit 14F). Dr. Thompson reported that the "entirety of (her) symptoms (were) related to lack of rehabilitation" (Exhibits 14F and 21F).

On November 11, 2013, the claimant was evaluated by Lucie King, M.D., for complaints of bilateral hip and shoulder pain (Exhibit 11F). Dr. King noted that the claimant appeared healthy on examination and reported that she had almost complete overhead motion of her right shoulder (Exhibit 11F). Dr. King noted that the claimant had some limited motion of her left shoulder and was unable to fully get her left arm over her head (Exhibit 11F). Dr. King diagnosed the claimant with adhesive capsulitis of the left shoulder, status post arthroscopy and debridement, as well as bilateral hip stiffness (Exhibit 11F).

On May 27, 2014, Huey Kidd, D.O., performed a consultative medical examination of the claimant at the request of the State agency on May 27, 2014 (Exhibit 16F). The claimant stated that she was applying for disability secondary to shoulder pain (Exhibit 16F). The claimant did not allege any knee pain, hip pain, headaches, or symptoms associated with irritable bowel syndrome (Exhibit

16F). On examination, the claimant was able to heel walk, toe walk, bend and touch her toes, and squat and stand without difficulty (Exhibit 16F). The claimant had a normal gait and her deep tendon reflexes were normal (Exhibit 16F). The claimant had good strength in her rotator cuff and Dr. Kidd could not detect any reduction in the range of motion of either one of her shoulders (Exhibit 16F). The claimant also had a normal range of motion of the remaining extremities, including her knees and hips (Exhibit 16F). Dr. Kidd's only diagnosis was an "injury to rotator cuff" (Exhibit 16F). He stated that while the claimant may be unable to perform any overhead work, he did not see any reason why she would be unable to maintain employment (Exhibit 16F).

Dr. Kidd opined that the claimant is capable of performing work at the medium level of exertion, with no limitations on her sitting, standing, or walking, with only occasional overhead reaching with her left and right hands, occasional climbing of ladders and scaffolds, frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, and occasional exposure to unprotected heights (Exhibit 17F and 19F).

Subsequent to the examination of Dr. Kidd, the claimant presented to Dr. Thompson on February 25, 2016, for follow-up on her complaints of "stabbing pain in the right shoulder that occurs occasionally" (emphasis added) (Exhibit 21F). The claimant reported "relatively diffuse" pain and an inability to sleep on her right shoulder (Exhibit 21F). The claimant denied specific episodes of instability or substantial weakness in the shoulder (Exhibit 21F). Dr. Thompson examined the claimant and he noted right shoulder subacromial tenderness; however, he reported that the claimant had "normal pain-free active range of motion" in the shoulders bilaterally (Exhibit 21F). Dr. Thompson also reported that the claimant had "no demonstrable instability" and that her rotator cuff strength was only "mildly limited due to pain" but showed no substantial deficits (Exhibit 21F). Dr. Thompson opined that "radiographically and clinically", he could "not detect any substantial structural cause for her shoulder pain" (Exhibit 21F). Dr. Thompson 's findings and conclusions are consistent with the findings and opinions of Dr. Kidd, and show that the claimant is capable of performing work with the limitations enumerated in the residual functional capacity above (Exhibits 16F and 21F).

In terms of the claimant's alleged carpal tunnel, electromyography/nerve conduction testing (EMG/NCV) in May 2010 showed bilateral carpal tunnel syndrome, right worse than left (Exhibits 1F and 12F). The claimant underwent a right carpal tunnel release on May 27, 2010 (Exhibit 1F). The claimant thereafter was returned to work (Exhibit 1F). From a [sic] 2010 through February 2016, the claimant did not seek any treatment for carpal tunnel syndrome, which suggests that the carpal tunnel release procedure performed in May 2010 was successful (Exhibits 1F and 23F).

On February 4, 2016, the claimant presented to Dr. Paul complaining of hand pain and swelling, worse on the right (Exhibit 23F). The claimant denied numbness and tingling in her fingers but reported that she had pain in the tips of her fingers that radiated up her arm (Exhibit 23F). Physical examination of the claimant's wrists was positive for Tinel's sign, which is used to detect irritated nerves (Exhibit 23F). Dr. Paul diagnosed the claimant with carpal tunnel syndrome (Exhibit 23F). Dr. Paul recommended a wrist splint for the claimant's right wrist, which she later reported was helpful in treating her hand pain (Exhibit 23F). Dr. Paul did not recommend any electrodiagnostic testing and did not discuss any treatment beyond splinting of the claimant's wrist, which suggests that the claimant's carpal tunnel syndrome is not currently a severe impairment (Exhibit 23F).

In terms of the claimant's alleged low back pain, the claimant presented to Hill Hospital of Sumter County on March 22, 2016, complaining of back pain (Exhibit 22F). Imaging studies of the claimant's spine showed findings consistent with degenerative disk disease; however, imaging studies indicated that the claimant's degenerative disk disease was mild (Exhibit 22F). X-rays of the claimant's thoracic spine showed maintained vertebral body heights, and intact pedicles with preservation of the normal thoracic curvature (Exhibit 23F). The reviewing radiologist's opinion was "negative thoracic spine" (Exhibit 23F). X-rays of the claimant's lumbar spine showed preservation of the normal lumbar curvature with no subluxation, no definite pars defects, and maintained disk spaces (Exhibit 20F). The reviewing radiologist opined that the claimant had a "probable transitional vertebra at L5 but otherwise unremarkable" lumbar spine (Exhibits 23F). There are [sic] no evidence of any significant back impairment. As noted above, Dr. Kidd examined the claimant, and he reported that the claimant had normal range of motion of the dorsolumbar spine with no neurological deficits noted (Exhibit 16F). Dr. Kidd also reported that the claimant was able to heel walk, toe walk, bend and touch her toes, squat and stand without difficulty spine [sic], and ambulate without a limp (Exhibit 16F).

\* \* \*

The opinion of Dr. Kidd is given great weight, as it is consistent with his findings on examination of the claimant and consistent with treating source records (Exhibits 13F, 14F, and 17F). However, giving the claimant every benefit of the doubt, the undersigned has reduced the exertional level at which the claimant can perform work to the light level in light of her treatment history and continued reports of pain (Exhibits 21F, 22F, and 23F).

The residual functional capacity assessment is based on the assessment of credibility of testimony, weighing of medical opinions and evaluation of documentary evidence in the record. The residual functional capacity is a finding of fact reserved to the Administrative Law Judge at the hearing (20 CFR 404.1545 and SSR 06-6p). The residual functional capacity is supported by the

opinion of Dr. Kidd and the objective medical evidence of record (Exhibits 13F, 14F, 16F, 17F, 19F, 21F, 22F, and 23F). The evidence of record shows that the claimant is capable of performing work at the light level of exertion with the additional restrictions as enumerated above.

(Tr. 29, 30-31, 33-36, 37).

## V. DISCUSSION

Eligibility for DIB and SSI benefits requires that the claimant be disabled. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1)-(2). A claimant is disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be severe, making the claimant unable to do the claimant's previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-11. "Substantial gainful activity means work that … [i]nvolves doing significant and productive physical or mental duties [that] [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510. To determine disability in Social Security cases, the ALJ utilizes the following five-step sequential evaluation:

> (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairment in the regulations; (4) if not, whether the claimant has the RFC to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.,* 457 F. App'x 868, 870 (11th Cir. 2012) (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips*

*v. Barnhart,* 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden of proving the first four steps, and if the claimant does so, the burden shifts to the Commissioner to prove the fifth step. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

If the claimant appeals an unfavorable ALJ decision, the reviewing court must determine whether the Commissioner's decision to deny benefits was "supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011) (citations omitted); *see* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). "In determining whether substantial evidence exists, [the reviewing court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The reviewing court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Id*. When a decision is supported by substantial evidence, the reviewing court must affirm "[e]ven if [the court] find[s] that the evidence preponderates against the Secretary's decision." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

As set forth above, Nathan has asserted two grounds in support of her argument that the Commissioner's decision to deny her benefits is in error.

## A. <u>Depression and Migraine Headaches</u>

Nathan asserts that the ALJ's determination that her depression and migraine headaches are non-severe impairments was in error because it is not supported by substantial evidence. She argues that the ALJ only cited and relied upon certain records to support her position and ignored other records that showed that these impairments are severe. (Doc. 16 at pp. 4-8). The Commissioner acknowledges that Nathan's medical records document her diagnoses of migraine headaches and depression, but contends that none of the medical records indicate that the migraine headaches and depression are severe and significantly limit her ability to do basic work activities. (Doc. 19 at p. 4). A "severe" impairment is one that significantly limits the ability to perform basic work activities. *See* 20 C.F.R. § 416.921. The plaintiff bears the burden of proving that an impairment significantly limits the ability to do basic work skills. *See Gibbs v. Barnhart,* 156 F. App'x 243, 246 (11th Cir. 2005).

The evidence in this case shows that Nathan did list migraine headaches and depression as conditions that limited her ability to work at the time she filed her claim for social security benefits. (Tr. 322). The ALJ's opinion shows that she did consider these impairments and after reviewing the medical records determined that they were non-severe. *See, supra,* at pp. 4-7. The issue presented here is whether, taking the totality of the evidence into consideration, substantial evidence supports the ALJ's finding. As noted above, this Court must be mindful that it cannot "decide the facts anew, reweigh the evidence, or

substitute [its] judgment for that of the [Commissioner]." *Chester*, 792 F.2d at 131.

Nathan points to several medical records that she contends the ALJ ignored. First, Nathan argues that the ALJ did not consider the Screening Assessment Intake form that was completed by a social worker at the West Alabama Mental Health Center on May 31, 2012 (shortly prior to the disability period she has alleged here). (Doc. 16 at p. 4). Although Nathan correctly points out that, in the Mental Status and Symptom Evaluation portion of the form, her depressed mood is listed as a major problem, she neglects to mention that the same form reflects that she has no problem with her attention span, concentration, social withdrawal, thought processes, fund of knowledge, memory, or any other aspect of her mood or affect and, importantly for this analysis, only a "minor problem" with her ability to work. (Tr. 618). Nathan also criticizes the ALJ's conclusion that she has no limitation in social functioning by pointing to a single episode that was in a hospital record dated November 4, 2012 when she was assaulted by her mentally challenged son and arguing that her reports to other providers that she socializes with family and friends was not accurate because of this. (Doc. 16 at p. 5). The ALJ did, however, acknowledge that there were stressors in Nathan's relationships with family members, but noted that she had never had issues with getting along with authority figures or co-workers or ever been fired from a job because of issues with social relationships. (Tr. 31-32).

Lastly, Nathan disagrees with the ALJ's statement that she did not return for further treatment for her depression after her July 2012 appointment at West

Alabama Mental Health Center. She points out that she was prescribed medication to treat her depression from other providers during the relevant period. (Doc. 16 at pp. 5-6). The ALJ's statement is somewhat vague regarding whether she was referring to Nathan not seeking any additional treatment at West Alabama Mental Health Center or treatment anywhere else. Nonetheless, the Court finds that this possibly inaccurate statement was harmless, if error at all, and does not affect supportability of the ALJ's conclusion. As noted by the Commissioner, the fact that Nathan's depression was admittedly treated effectively with medication (Tr. 60-61) without the need for any further therapy or hospitalization belies her claim that her depression resulted in a significant limitation on her ability to perform basic work activities. *See* 20 C.F.R. § 416.921. Based upon the totality of the evidence, the Court finds that the ALJ's conclusion that Nathan's depression was not a severe impairment is supported by substantial evidence.

With regard to her finding that Nathan's migraine headaches were not a severe impairment, the ALJ stated:

> However, although the record shows that the claimant complained of headaches and symptoms associated with irritable bowel syndrome as early as 2008, the claimant's medical records show that she has not complained of or sought treatment for headaches since March 2012 or for irritable bowel syndrome since October 2011(Exhibits 5F and 6F). The claimant has not complained of or been treated for these conditions since at least 3 months before her alleged onset date of June 26, 2012. This is inconsistent with her report that she wakes with headaches daily and her testimony that she has 5 to 6 flares of irritable bowel syndrome every night (Exhibits 2E and 5E). Recent treating source records from Marlo Paul, M.D., document complaints of headache, associated with draining in her ears, cough, and nasal congestion (Exhibit 23F). However, the headaches complained of are not consistent with the claimant's previous reports of migraine headaches and Dr. Paul diagnosed the claimant with a sinus

> infection, for which he prescribed treatment with an antibiotic, Augmentin
> (Exhibit 23F). The claimant's sinus infection was responsive to treatment
> (Exhibit 23F).

(Tr. 29).

As noted by the Commissioner, many of the medical records cited by Nathan to support her argument that her migraines constitute a severe impairment pre-date the relevant time period. However, there are records not cited by the ALJ that do support Nathan's claim that she suffers from daily migraine headaches. On March 13, 2012, approximately three months prior to her alleged onset date, Nathan was seen at the Holifield Clinic complaining of migraine headaches that had been occurring for years, were present when she went to sleep and when she awoke, and were distracting in severity. (Tr. 591). On February 12, 2015, when she first began treating with Dr. Marlo Paul, Nathan complained of migraine headaches that occurred on a daily basis on the frontal part of her head. (Tr. 1050). She stated that if felt like being stabbed by a sharp ice pick, that light could trigger it, and that light and loud noise made it worse. (*Id*.). Dr. Paul made a diagnosis of migraines and prescribed Naprosyn. (Tr. 1051). As noted in the ALJ's opinion, when she saw Dr. Paul on March 3, 2016, she complained, inter alia, of headaches for the previous three weeks that were located on her forehead and back of her head and throbbing in nature. (Tr. 1035). She also complained of drainage in her ears, a cough, and nasal congestion. (*Id*.). Dr. Paul diagnosed her with migraines and acute sinusitis, but did not specifically prescribe any medication or treatment for the migraines. (Tr. 1035-36). It should be noted that Nathan saw Dr. Paul on seven occasions

between those two dates at which times she complained at various times of back, shoulder, wrist, and abdominal pain, but did not complain of headaches. (Tr. 1036-49). The absence of complaints of headaches during that time period does support the ALJ's conclusion that Nathan's report of daily headaches is not entirely credible. There seems to be no doubt that there is evidence showing that Nathan suffers from migraine headaches. However, that is not the determining factor in a disability determination. Rather, Nathan must show that the migraine headaches constitute a severe impairment; that is, she must prove that they cause a significant limitation on her ability to perform basic work activities. *See* 20 C.F.R. § 416.921.

The ALJ's determination that Nathan's sporadic reports of headaches do not constitute a severe impairment is supported by substantial evidence. In addition to the foregoing evidence, which shows the sporadic nature of the headaches, the medical records do not establish headaches so extreme as to warrant referral to a specialist. Most importantly, Nathan did not produce evidence of disabling headaches that caused significant limitations in her ability to work. 42 U.S.C. § 423(d)(5)(A); *see Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003) (finding that claimant bears the burden of proving disability and is responsible for producing evidence in support of his claim). In fact, Nathan testified at the hearing before the ALJ that she continued working as an overnight stocker at Wal-Mart until July 2, 2013, at which time she became unable to work due to pain in her shoulders, wrists, and back. (Tr. 56-57, 58). With regard to her headaches, she testified that she had recently switched medications from

Naprosyn to Excedrin. (Tr. 61). She further testified that the only problems her headaches cause are "[p]roblems with my vision, trouble with sunlight." (Id.). None of her doctors placed any work restrictions on her due to her headaches. There is simply no evidence in the record, even from Nathan herself, that her migraine headaches placed a significant limitation on her ability to work. The evidence actually shows that she did work during the majority of the time that she complained of headaches. Based on the foregoing, the Court finds that the ALJ's decision in regard to Nathan's complaints of headaches was supported by substantial evidence and was not in error.

**B.  Application of the Pain Standard**

The Eleventh Circuit requires a claimant who claims disability based on complaints of disabling pain to establish "(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991), *quoted in Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005); *see* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1529, 416.929. "If a claimant testifies as to his subjective complaints of disabling pain and other symptoms … the ALJ must clearly 'articulate explicit and adequate reasons' for discrediting the claimant's allegations of completely disabling symptoms." *Dyer,* 395 F.3d at 1210 (quoting *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995)). The Eleventh Circuit does not require an explicit finding as to credibility as long as the implication is

obvious to the reviewing court. *Dyer,* 395 F.3d at 1210. "A clearly articulated

credibility finding with substantial supporting evidence in the record will not be

disturbed by a reviewing court." *Davis v. Astrue*, 346 F. App'x 439, 440 (11th Cir.

2009) (quoting *Foote*, 67 F.3d at 1562). This is so even if some of the reasons for

questioning the claimant's credibility stated by the ALJ are suspect. *See id.* at

441 (reversing the District Court's reversal of the ALJ's decision denying benefits

because it found that the inconsistencies between the objective medical findings

and the claimant's subjective complaints of pain, which were pointed out in the

ALJ's decision, constituted substantial evidence supporting the ALJ's

determination).

Nathan argues that the ALJ did not properly apply the "pain standard" in

this case because she did not include a lengthy discussion of Nathan's

subjective complaints and reports of daily activities in her opinion and did not

discuss all of the objective medical evidence of record. (Doc. 16 at pp. 10-12).

The Commissioner counters with the contention that, while acknowledging that

Nathan experienced functionally limiting pain, the ALJ found her allegations of

subjective disability to lack credibility. According to the Commissioner, the ALJ's

explanation met the requirements set forth by the Eleventh Circuit and was

supported by substantial evidence. (Doc. 19 at pp. 9-12).

The ALJ stated the following with regard to her assessment of Nathan's

subjective complaints:

> Although the claimant has testified to daily activities which are fairly
> limited, two factors weigh against considering these allegations to
> be strong evidence in favor of finding the claimant disabled. First,
> allegedly limited daily activities cannot be objectively verified with

any reasonable degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision (Exhibits 16F and 21F). Overall, the claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision.

* * *

The third functional area is concentration, persistence or pace. In this area, the claimant has mild limitation. The claimant reported that she is able to pay attention for "a long time" (Exhibit 4E). She reported that she finishes things that she starts (Exhibit 4E). The claimant reported that she follows written and spoken instructions "very well" (Exhibit 4E). She reported that her impairments do not affect her ability to concentrate but did report problems completing tasks (Exhibit 4E). During the intake process at West Alabama Mental Health Center in May 2012, the claimant exhibited no problems with her attention span, concentration, memory, or coherence (Exhibit 7F). At a July 5, 2012, return visit, the claimant was oriented to person, place, time, and situation, and she had no thought or perceptual disturbances (Exhibit 7F). At the recent hearing, the claimant testified that she is able to pay attention for only 15 minutes at a time and testified that she cannot maintain focus for 2 hour periods. The claimant's testimony is not consistent with the objective medical evidence or her prior reports; nevertheless, the undersigned, in giving the claimant the benefit of the doubt, finds that she has mild limitation in concentration, persistence, and pace.

(Tr. 30-31).

Comparing Nathan's subjective complaints to the objective medical findings and opinions, the ALJ stated:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

The ALJ then included a thorough review of Nathan's medical treatment for the pain she complained of in her shoulders, wrists, and lower back, *see, supra,* at pp. 7-11, before concluding:

> However, giving the claimant every benefit of the doubt, the undersigned has reduced the exertional level at which the claimant can perform work to the light level in light of her treatment history and continued reports of pain (Exhibits 21F, 22F, and 23F).
>
> The residual functional capacity assessment is based on the assessment of credibility of testimony, weighing of medical opinions and evaluation of documentary evidence in the record. The residual functional capacity is a finding of fact reserved to the Administrative Law Judge at the hearing (20 CFR 404.1545 and SSR 06-6p). The residual functional capacity is supported by the opinion of Dr. Kidd and the objective medical evidence of record (Exhibits 13F, 14F, 16F, 17F, 19F, 21F, 22F, and 23F). The evidence of record shows that the claimant is capable of performing work at the light level of exertion with the additional restrictions as enumerated above.

(Tr. 37).

Having reviewed the evidence and the arguments of both parties, the Court finds that the ALJ was correct in finding that while Nathan did establish evidence of an underlying medical condition, she did not establish either "objective medical evidence that confirms the severity of the alleged pain arising from that condition" or "that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Holt,* 921 F.2d at 1223; *see Dyer*, 395 F.3d at 1210. The ALJ here did articulate explicit and adequate reasons for discrediting Nathan's allegations of completely disabling symptoms. *See Dyer,* 395 F.3d at 1210. As noted above, "[a] clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Davis,* 346 F. App'x at

440-41. The Court finds that the conclusion reached by the ALJ that Nathan was not entirely credible and that her subjective complaints of pain did not support a finding of total disability was supported by substantial evidence and was not in error.

## **CONCLUSION**

In light of the foregoing, it is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff benefits be **AFFIRMED**.

**DONE** and **ORDERED** this the **30th** day of **March, 2018**.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**